IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RICO S. HARVEY,<br><br>                 **Plaintiff,**<br><br>v.<br><br>KYLE EASTON and PIERCE MARTIN,[1]<br><br>                 **Defendants.** | Case No. 20-cv-954-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Rico S. Harvey, who at the time he filed his Complaint was an inmate of the Illinois Department of Corrections at Pinckneyville Correctional Center, brought this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. His Complaint (Doc. 1) alleged that Kyle Easton used excessive force on him, and Pierce Martin failed to intervene, all in violation of the Eighth Amendment.

This matter is now before the Court on Defendants' motion for summary judgment (Docs. 40, 41, 45). Harvey filed a response (Doc. 54) in opposition to the motion.

### BACKGROUND

On September 18, 2020, Harvey filed his Complaint (Doc. 1) alleging claims of excessive force and failure to intervene. He was allowed to proceed on the following two counts:

---

[1] Pierce Martin has now identified himself by his proper name (Doc. 41, p. 1). The Clerk of Court is **DIRECTED** to correct the docket to reflect Martin's proper name.

>   Count 1:   Eighth Amendment excessive force claim against Easton.
>
>   Count 2:   Eighth Amendment failure to intervene claim against Martin for failing to stop Easton from using excessive force.

(Doc. 13, p. 2).

Both claims relate to an encounter which took place on July 26, 2020. Harvey was in segregation at the time but was entitled to visitations (Doc. 41-1, p. 42). Specifically, he was housed in Housing Unit 5, Cell 24, L1 (*Id.* at p. 43). He was set for a video visit with his wife which he testified normally lasted 15 to 20 minutes (*Id.* at pp. 32, 44). The video visit was set for 7:20 p.m. (Doc. 41-5). Because Five House did not have video monitors, Harvey had to walk to the main visitation room in the Annex Building ("Annex") (Doc. 41-1, pp. 32-33, 44).

Harvey testified that Easton transported him from his cell to the Annex for the video visit (Doc. 41-1, p. 45). He testified that the two argued during the escort because Easton was late picking Harvey up from his cell (*Id.*). Easton told Harvey to shut up or he would cancel his visit; Harvey complied (*Id.*). Harvey was put in handcuffs behind his back and taken to the shower area where restraints were placed around his wrists with the lead chain under his testicles and buttocks (*Id.*; Doc. 45, pp. 1-2). Easton testified in an affidavit that the waist chain is typically wrapped around the inmate's waist and secured in the back (Doc. 45, p. 1). The lead chain is then attached to the front of the waist chain, placed between the inmate's legs, and connected to the rear of the waist chain (*Id.*). The lead chain allows the officer to maintain control of the individual being escorted (*Id.*). Harvey testified that he believed that prison regulations required that he be shackled at the waist but not with the lead chain under his genitals (Doc. 41-1, pp. 31-32).

Harvey was escorted to the visitation room and spoke with his wife (Doc. 41-1, p. 46).

He told his wife that he had words with Easton. According to Harvey, his wife told him to leave it alone, but he stated he felt he needed to say something to Easton (*Id*. at p. 46). After the visit, Easton returned to escort Harvey back to his cell (*Id*. at p. 46).[2] Harvey testified that he again had words with Easton, and they were cussing at each other (Doc. 41-1, p. 46, 51). Harvey testified that Easton yanked on the lead chain real hard and kept "snatching on the chain" on the way back to Five House (*Id*. at pp 46-47). According to Harvey, Easton started yanking on the chain coming out of the Annex, right at the gate to the healthcare unit (*Id*. at p. 55). Harvey testified that after the first yank he turned and informed Easton there were cameras capturing the incident (*Id*. at pp. 46-47, 53). Two other officers were at the gate and, according to Harvey, the officers laughed at Easton's actions and "kept going on about their business" (*Id*. at p. 55). Harvey testified that he was forced up onto his "tippy-toes" during the time Easton yanked on the chain due to the pain (*Id*. at p. 52). According to Harvey, Easton yanked on the lead chain four or five times (*Id*. at pp. 52-53). He stopped pulling on the chain in front of the healthcare building by the gate (*Id*. at p. 56).

According to Harvey, neither Easton nor Martin spoke to each other during the incident (*Id*. at p. 53, 56). Martin joined them outside of the visitation room, and when he saw Harvey and Easton arguing he stepped in and joined the escort (*Id*. at p. 47, 52).[3] Martin eventually took the chain from Easton (*Id*. at p. 56). Harvey testified that he believed Martin

---

[2] Harvey testified that the video visit was cut short and argued in his response that he did not receive the full amount of time on the visit because Easton was late to his cell (Doc. 41-1, p. 46; Doc. 54, p. 4). The call pass records indicate that the video visit started at 19:20 and ended at 19:35 (Doc. 41-5).

[3] It is unclear from the testimony whether Harvey believes Martin joined them in the Annex building, directly outside the Annex, or at the gate by the healthcare unit. He testified that the healthcare unit was right next to the gate and that at that location he saw Martin approach from break and join the escort (Doc. 41-1, p. 47). He later testified that Martin was present outside of the visitation room and when he heard Harvey and Martin argue, he joined the escort. This later testimony suggests that Martin joined the escort before leaving the Annex (*Id*. at p. 52).

took the chain as they were crossing the parking lot, possibly in front of the healthcare unit, by the gate by the healthcare unit, or in the parking lot near the kitchen (*Id.*). Harvey testified it was not until after Easton had yanked on the chain numerous times that Martin took over with the lead chain (*Id.*). Harvey testified that Easton continued to argue with him, indicating that he would beat him up (*Id.* at p. 57).

According to video footage from that date and Easton's affidavit, Martin escorted Harvey with the lead chain, and Easton walked next to Martin (Doc. 45, p. 2). Two officers, Sutliffe and Ummerikhoufe, were in front and they opened the gate near the Annex building for the group (*Id.*). At the gate, Easton testified he took control of the lead chain because Harvey was making verbal statements and causing agitation (*Id.*). Easton testified that he took the lead chain to ensure proper control (*Id.*). Easton continued to control the lead chain until Harvey was placed in his cell (*Id.*).

The Court has reviewed the video footage provided by the parties. The first video clip clearing shows that Martin, not Easton, escorted Harvey out of the visitation area and to the gate (Doc. 41-4, Video Clip D1 Camera 1). Easton walks to the left of Harvey and Martin. He is clearly distinguishable as being the only of the two officers in a hat. Officers Sutliffe and Ummerikhoufe approach from the front left of the group (*Id.*). As the parties approach the gate, either Sutliffe or Ummerikhoufe open the gate; the other officer stands to the side of the gate. Martin, still escorting Harvey from behind, and Easton approach the gate (Doc. 41-4, Video Clip D2 Camera 5). Easton, the officer in the hat, enters the gate first, followed by Harvey and Martin, who is directly behind Harvey (*Id.*). After entering the gate, Harvey stops and turns to Easton (*Id.*). Although difficult to see due to a glare in the screen, Easton does at some point take control of the chain (*Id.*). In the next video, taken right after the escort entered

the gate and Easton took control of the chain, the group walk calmly across the length of the sidewalk (Doc. 41-4, Video Clip D3 Camera 16). There is no indication that Easton is tugging on the chain, and Harvey does not walk on the top of his toes (*Id.*; Doc. 41-1, p. 52). At no point in any of the videos does it appear that Harvey is in discomfort or walking in a different manner, which would indicate that a chain was being pulled against his crotch (Doc. 41-4, D3-D7).

Once he returned to his cell, Harvey testified that he wrote an emergency sick call request because he was peeing blood (Doc. 41-1, p. 48). The nurse denied seeing blood, and Harvey testified he was given an appointment with a doctor (*Id.*). On July 29, 2020, Harvey had a sick call visit with the nurse (Doc. 41-6). He complained of testicular pain from a previous confrontation with staff (*Id.* at p. 1). The nurse was unable to verify the injuries, noting that the injures were unfounded, and there were no abnormalities (*Id.*). Because he complained of pain, he was prescribed acetaminophen (*Id.*). During a med call line on August 21, 2020, he again complained of pain stemming from the incident (*Id.* at p. 4).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing FED. R. CIV. P. 56(a). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

"Correctional officers violate the Eighth Amendment when they use force not in a good faith effort to maintain or restore discipline, but maliciously and sadistically for the very purpose of causing harm." *Wilborn v. Ealey*, 881 F.3d 998, 1006 (7th Cir. 2018) (quotations omitted). A plaintiff need not demonstrate a significant injury to state a claim for excessive force; however, "a claim ordinarily cannot be predicated on a de minimis use of physical force." *DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000). "Thus, not every push or shove by a prison guard violates a prisoner's constitutional rights." *Id*. And simple verbal harassment alone does not rise to the level of a constitutional violation. *Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015).

An officer who has "a realistic opportunity to step forward and prevent another officer from violating a plaintiff's right through the use of excessive force but fail[s] to do so may be held liable." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Though legally distinct, the fate of a plaintiff's failure to intervene claim is linked to the underlying excessive force claim, because "if there was no excessive force then there can be no failure to intervene." *Abdullahi v. City of Madison*, 423 F.3d 763, 767–68 (7th Cir. 2005).

## ANALYSIS

### A. Excessive Force

Harvey states in an affidavit attached to his response that Martin came to escort him after his video visit and he saw Easton once he was outside of the Annex (Doc. 54, pp. 4-5). He argues that Easton took the lead chain from Martin at the gate, and it was at that point that Easton began to pull on the lead chain (*Id.*). But his statements in his brief are completely contradictory to his testimony at his deposition. In his deposition, Harvey testified that Easton retrieved him from the visitation room and that he immediately began pulling on the chain (Doc. 41-1, pp. 46-47). In fact, he testified that he stopped and spoke to Easton, reminding him there were cameras present (*Id.* at pp. 46-47, 53). He testified that the cameras right at the gate would capture the incident and that as he was coming through the gate, Easton kept yanking on the chain (*Id.* at p. 47). According to Harvey's testimony, they met Martin either before or at the gate and Easton asked Martin to walk with them back to the unit (*Id.* at p. 47, 52). His testimony suggested that Martin did not take over the lead chain until after Easton "did all this yanking and janking with the chain" (*Id.* at p. 56).

But the video footage does not reflect Harvey's version of the events. The video footage presented is from various angles and locations throughout the entirety of Harvey's walk from the visitation room to his cell. After reviewing the footage numerous times, the Court is unable to find any evidence to support Harvey's testimony. In fact, it is the exact opposite of his testimony. Harvey testified that Easton initially escorted him and immediately began pulling on the chain. He testified that Martin approached the two but did not take over until they were through the gate, somewhere on the back parking lot (Doc. 41-1, pp. 52-56). But the video makes clear that Martin initially controlled the chain, and Easton took over

after walking through the gate. He testified that two officers walked out of the gate; they were laughing, did not intervene, and went "about their business" (*Id.* at p. 55). But the video shows the two officers approaching to the left of the group, open the gate for them, and then follow the group through. The two officers followed the group back to Harvey's cellhouse (Doc. 41-4, D1-D7).[4] When Harvey turns toward Easton after exiting through the gate, there is no indication that Easton has a hand on the chain at that point or that the chain was yanked causing Harvey to stop and warn him about the presence of video cameras as he testified (*Id.*; Doc. 41-1, p. 46;. 41-4, Video Clip D2 Camera 5). The footage clearly contradicts and refutes Harvey's testimony.

Although summary judgment is usually only proper when there are no disputes of fact, the Seventh Circuit has instructed that "[w]hen the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379-80 (2007)). "A conclusive video allows a court to know what happened and decide the legal consequences." *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380, 386 (2007)). Here, the video clearly shows Harvey's entire interaction with Easton and Martin during the escort. That video clearly contradicts and refutes Harvey's deposition testimony.

---

[4] Easton's testimony on this point appears to be contradictory to the video as well. He testified that Sutliffe and Ummerikhoufe remained at the gate after letting the group through, but the video clearing shows Sutliffe and Ummerikhoufe following the group through the gate and to the cellhouse (Doc. 45, p. 2; Doc. 41-4, D2-D7). Although contradictory, the Court does not find the fact of whether Sutliffe and Ummerikhoufe remained at the gate or followed behind to be material. They clearly were not going about their business as Harvey testified, and there is no evidence that they were laughing in any of the video footage.

Perhaps now faced with video evidence of the incident that contradicts his earlier testimony, Harvey changed his testimony in his affidavit to match the video (Doc. 54, pp. 4-5). He now states that Easton got mad at the gate and took the chain from Martin. As he began to walk from the gate, he stated that Easton began to pull on the chain four or five times (Doc. 54, pp. 4-5). But the third video, taken right after the group entered the gate, provides a clear view of the group as they pass. Although it does not show the initial exchange of the chain from Martin to Easton, it depicts the officers and Harvey directly after the transfer. Nothing in the video supports either Harvey's original testimony or his new version of events in his affidavit (Doc. 54, 4-5). There is no indication that Easton pulled on the chain four or five times. His hand appears to be in the same position through the entire frame, and there is no reaction from Harvey. Harvey's gait remains steady throughout the clip (Doc. 41-4, Video Clip D3 Cam 16). There is simply no evidence in the video from which a jury could find that Easton used excessive force. *See Williams*, 809 F.3d at 942 (no issue of fact when "[t]he video clearly depicts the incident."). As such, the Court finds that Easton is entitled to summary judgment as to Count 1.

**B. Failure to Intervene**

Because there is no evidence from which a jury could find that Easton used excessive force, the Court finds that Martin is also entitled to summary judgment on the failure to intervene claim. Here, there is no evidence of exercise force and no evidence to suggest that Martin was aware that excessive force was being used. *Harper*, 400 F.3d at 1066. Further, nothing in the video evidence suggests that Martin saw or was aware of *any* use of force. Other than the short portion of the footage showing the transfer of the chain from Martin to Easton, all members of the group—including Harvey—walk forward with no apparent

interaction. (*See* Doc. 41-4, Video Clip D2-D7). There is no evidence to support Harvey's failure to intervene claim. Thus, Martin is also entitled to summary judgment.

## Conclusion

For the reasons stated above, the summary judgment by Easton and Martin (Docs. 40, 41) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:   February 21, 2023**

*[signature]*

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**